IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF KAYLEY V.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF KAYLEY V., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

KAYLEY V., APPELLANT.

Filed May 12, 2026.    No. A-25-739.

Appeal from the Separate Juvenile Court of Sarpy County: SARAH M. MOORE, Judge. Affirmed.

Todd A. West, Sarpy County Public Defender, and Chelsie Krell for appellant.

Brianna L. McLarty, Sarpy County Deputy County Attorney, and Stephanie Swenson, Senior Certified Law Clerk, for appellee.

MOORE, PIRTLE, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Kayley V. appeals the Sarpy County Juvenile Court's order adjudicating her as a minor within the meaning of Neb. Rev. Stat. § 42-347(1) (Cum. Supp. 2024) because she committed the offense of disturbing the peace, a Class III misdemeanor. Kayley contends that the evidence was insufficient to support her adjudication for disturbing the peace. For the reasons set forth herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

### 1. BACKGROUND

Bryan Middle School (BMS) and Bryan High School (BHS) are schools located in Sarpy County, Nebraska, and are within the Omaha Public School (OPS) district. The two schools share a campus and a parking lot. On November 13, 2024, at approximately 2:26 p.m., in response to a concern reported by a BHS student, BMS' school resource officer (SRO) Jessica Manning alerted BHS SRO Jim Severn regarding a potential issue in BHS' parking lot. SRO Manning reviewed BMS' video security camera feed, which includes camera systems for both BMS and BHS. Viewing the live camera footage, SRO Manning could see multiple vehicles and groups of people congregating in BHS' parking lot, which was unusual while class was in session. The live footage was not clear enough to allow SRO Manning to identify any individuals.

While SRO Manning was reviewing the video, SRO Severn went to the parking lot to address the situation and, once there, he requested immediate assistance. There were between 15 and 20 students in BHS' parking lot, which was an unusual number of students to be congregating. After SRO Severn and four security officers arrived in the parking lot, the students ran in different directions and loaded into three to five vehicles. All of the individuals and vehicles were able to avoid apprehension except for seven people in a small black five-seat SUV. Although this SUV originally contained 10 individuals, three were able to get away.

SRO Manning immediately drove her police cruiser from BMS to the parking lot where she observed the black SUV, which had been stopped and was surrounded by SRO Severn and other BHS security staff. Officer Severn detained the driver of the SUV, and other BHS security staff indicated to her that "there were numerous other individuals in the vehicle who were acting in a suspicious or odd manner" and that SRO Manning's assistance was needed in detaining the remaining six juveniles. An additional 11 officers arrived on scene due to what SRO Manning described as "a large unpredictable situation" occurring on school property. SRO Manning was able to determine from OPS records that all of the detained students attended OPS schools, but none attended BHS. One of the juveniles who had been sitting in the back seat of the SUV was identified as Kayley.

As a result of the parking lot incident, BHS principal Anthony Clark-Kaczmarek placed the school on "secure status" at 2:50 p.m. "Secure status" is the standard response protocol which provides that "when there is an incident happening outside a school building or in the general vicinity that poses a potential threat to the safety of students inside the building, the school will enter secure status, which means all exterior doors to the building are locked and secured and nobody is allowed to go inside or outside of the school, obviously except for . . . administration and security doing official business." The school's principal decides when the secure status can be lifted. On the afternoon of November 13, Clark-Kaczmarek lifted BHS' "secure status" at approximately 3:04 p.m., which was prior to BHS' normal dismissal time of 3:05 p.m.

### 2. ADJUDICATION PETITION

As a result of the aforementioned incident, the State filed a juvenile petition that, as amended, alleged that Kayley was a child within the meaning of § 43-247(1), (2), or (4), based on

her committing the offense of disturbing the peace, a Class III misdemeanor. The amended juvenile petition alleged that Kayley was born in October 2007, and that on or about November 13, 2024, Kayley intentionally disturbed the peace and quiet of Clark-Kaczmarek and BHS.

### 3. Adjudication Hearing

The adjudication hearing was held over 1 day in August 2025. In addition to the facts as recited above, the State adduced testimony from witnesses including SRO Manning and BHS principal Clark-Kaczmarek.

### (a) SRO Manning's Testimony

SRO Manning testified that the primary responsibility of an SRO is student safety, which "means being aware of odd or suspicious circumstances that are not normal on school grounds" and includes the presence of people congregating in the school parking lot during school hours. Additionally, since none of the individuals congregating in the parking lot were recognized as BHS students, this

> increased the concern that there was nefarious activity going on. And in my years of experience as a [SRO], when juveniles who do not go to school collect on school property during school hours it is often . . . because they have a disagreement or an issue with somebody that goes to that school and [they] are there to confront them.

SRO Manning testified that 2 days prior to the incident, groups of unknown individuals had assaulted a BMS student after he left school, which caused her concern that the juveniles on BHS property on November 13, 2025, were there to assault students as they were dismissed from school.

SRO Manning testified that the security footage was not recorded or logged into evidence, due to a miscommunication between herself and SRO Severn. However, SRO Manning did take some still photos from the screen in the hope that this would assist law enforcement in identifying the vehicles and persons at a later time. SRO Manning admitted that Kayley, who was initially in the backseat of the vehicle, did not yell, use profanity, and did not use any fighting words.

### (b) Clark-Kaczmarek's Testimony

Clark-Kaczmarek testified that on November 13, 2024, after he was notified that there were multiple unidentified individuals in the BHS and BMS shared parking lot, he decided to place the school into secure status for two reasons. The first reason was that students from other schools had recently come onto school property, trespassing, and attempting to steal cars. The second reason was that the incident occurred at a time of day when almost the entire student population would be getting ready to exit the building. Clark-Kaczmarek expressed that there was cause for concern because the unidentified group of individuals in the parking lot had "engaged" one of the BMS students and he did not know "what I was sending fifteen hundred students out [into]." He also noted that one of the cars "tried to . . . run over one of our security guards by backing into them. So, their behavior indicated they had no reason to be on our property."

Clark-Kaczmarek noted that his job duties were disrupted when the school was in secure status because he could not allow any parents to pick up their children, no deliveries could occur,

students returning from another event could not enter the school, and students who have appointments could not leave the building. He said that placing the school in secure status required his full attention as well as the attention of two assistant principals, six security officers, three deans of students, and 10 individuals in the front office. He also testified that he had to notify the community if the school entered into "any sort of standard response protocol activity." He explained that the "community" that he had to notify included "[s]tudents, families, parents, guardians, staff, [and] anyone that is any sort of stakeholder in the [BHS] community." He also fielded questions from parents who saw the police presence in the parking lot.

Clark-Kaczmarek also testified that the OPS code of conduct includes a trespassing stipulation that is applicable to every OPS student regardless of what OPS school that student attends. He also said that "[t]here is a handbook card that can and should be signed by every student when they arrive every year." The evidence regarding OPS' code of conduct was received without objection.

#### 4. JUVENILE COURT'S ADJUDICATION ORDER

In August 2025, the juvenile court adjudicated Kayley as a child within the meaning of § 43-247(1) based upon its finding that the allegations in the amended juvenile petition were true, by proof beyond a reasonable doubt that, on or about November 13, 2024, Kayley, who was under the age of 18, was on BHS' property and disturbed the peace and quiet of Clark-Kaczmarek and BHS. Specifically, the court's order, as corrected by an order nunc pro tunc, found that:

• the testimony of the State's witnesses was "credible, probative, and entitled to weight";

• various individuals, including Kayley, were intentionally present on BHS property during school hours close to dismissal time and without authorization;

• all vehicles attempted to flee the scene when approached by school security and all but one vehicle and seven students successfully eluded apprehension and one of the vehicles "hit a [BHS] security guard;

• pursuant to OPS's student code of conduct, Kayley was prohibited from being on the property of another school during school hours and reasonably should have known that doing so may cause a disturbance; and

• the intentional act of individuals, including Kayley, being present on BHS' property, caused a disturbance on BHS property, which disrupted the ordinary duties of BHS staff and led Clark-Kaczmarek to authorize and implement "Secure Status" protocol at BHS for student safety due to the presence and actions of unauthorized individuals on school property, that the "Secure Status prevented students from entering or leaving BHS, and caused Clark-Kaczmarek to alert the community of the secure status" causing the parents of BHS students to be alarmed and to contact BHS for information.

Kayley has timely appealed to this court following her adjudication.

### III. ASSIGNMENTS OF ERROR

Kayley's sole assignment of error is that there was insufficient evidence to support the juvenile court's determination that she committed the offense of disturbing the peace because the

State failed to prove Kayley intentionally disturbed the peace and quiet of any person, family, or neighborhood.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Jeovani H.*, 316 Neb. 723, 6 N.W.3d 539 (2024). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of facts over the other. *Id.*

## V. ANALYSIS

Kayley contends that there was insufficient evidence to support the juvenile court's determination that she committed the offense of disturbing the peace. Specifically, Kayley contends that the State failed to prove she intentionally disturbed the peace and quiet of any person, family, or neighborhood. She further argues that "the State collapses the distinction between precautionary administrative decisions and an actual breach of peace, and it improperly attributes institutional security choices and group conduct to Kaylee's conduct." Reply brief for appellant at 5.

When an adjudication is based upon § 43-247(1), as is the case here, the allegations must be proved beyond a reasonable doubt. See *In re Interest of Elainna R.*, 298 Neb. 436, 904 N.W.2d 689 (2017). A finder of fact may draw reasonable inferences from the facts and circumstances proved. *Id.*

Here, the petition for adjudication alleged that Kayley committed the offense of disturbing the peace. Neb. Rev. Stat. § 28-1322(1) (Reissue 2016) provides that "[a]ny person who shall intentionally disturb the peace and quiet of any person, family, or neighborhood commits the offense of disturbing the peace." As the Nebraska Supreme Court stated in *State v. Broadstone*, 233 Neb. 595, 599, 447 N.W.2d 30, 33 (1989), quoting *State v. Coomes,* 170 Neb. 298, 102 N.W.2d 454 (1960):

> A breach of the peace is a violation of public order. It is the same as disturbing the peace. The definition of breach of the peace is broad enough to include the offense of disturbing the peace; it signifies the offense of disturbing the public peace or tranquility enjoyed by the citizens of a community. [Citations omitted.]
>
> Breach of the peace is a common law offense. The term "breach of the peace" is generic and includes all violations of public peace, order, decorum, or acts tending to the disturbance thereof.

A finder of fact may draw reasonable inferences from the facts and circumstances proved. *In re Interest of Elainna R., supra* (juvenile court found proof beyond reasonable doubt that juvenile knowingly or intentionally disturbed peace of high school security officer by engaging in fighting with another student, which necessitated security officer's physical involvement).

Kayley argues that § 28-1322 requires an intentional act and that "[t]he State failed to present any evidence that Kayley engaged in conduct or intentional acts that could be interpreted

as disturbing the peace of the community." Brief for appellant at 10. While it is true that § 28-1322 requires an intentional act, it does not require the State to prove that the defendant intended to disturb the peace of others; it only requires that the defendant's intentional acts resulted in disturbing the peace of others. *State v. Thomas*, 25 Neb. App. 256, 904 N.W.2d 295 (2017). And in *State v. Broadstone*, 233 Neb. 595, 601, 447 N.W.2d 30, 34 (1989), the Nebraska Supreme Court quoted from *State v. Burns,* 35 Kan. 387, 11 P. 161 (1886), for the following proposition:

> Although the words and acts of the defendant may have been primarily directed against some person other than [the complaining witness] or his family, yet if the defendant's words and acts were wrongful and willful, and the natural and necessary consequences of them were the disturbance of [the complaining witness] and his family, the defendant is equally guilty as though she had no other intention than the disturbance of [the complaining witness] and his family. . . .

Taken together, the question is whether the State proved, beyond a reasonable doubt, that Kayley's actions were wrongful and willful and the natural and necessary consequences of them were the disturbance of Clark-Kaczmarek and/or BHS.

Kayley compares the facts in her case to those present in *State v. Hai Dang*, 220 Neb. 120, 368 N.W.2d 486 (1985). She contends that the facts in her case are even less intrusive than those present in *Hai Dang*, in support of her position that her conduct did not rise to the level necessary to prove that she committed the offense of disturbing the peace. In *Hai Dang*, the Nebraska Supreme Court held that there was insufficient evidence to support a disturbing the peace conviction where the defendant, who was the victim's former boyfriend, called the victim once or twice after being told not to contact the victim, told the victim he was bringing her a birthday card, and showed up at the victim's home but not did not create a disturbance. In reversing the defendant's conviction, the appellate court noted that "[t]here was absolutely no testimony from anyone that the defendant created any sort of a disturbance" when he arrived at the victim's home. *State v. Hai Dang*, 220 Neb. at 121, 368 N.W.2d at 488.

Kayley also argues that her conduct did not rise to the level of conduct in which disturbing the peace convictions have not been upheld and, in support of that claim, Kayley argues that her conduct was less than that described in *State v. Broadstone*, 233 Neb. 595, 447 N.W.2d 30 (1989), wherein the Nebraska Supreme Court upheld the defendant's disturbing the peace conviction on evidence that the defendant's use of foul language in the presence of school children and hitting a stick against telephone pole resulted in the scaring of young children and an adult who testified he was upset by defendant's conduct.

Although we acknowledge that Kayley's conduct did not involve yelling or profanity, Kayley intentionally chose to congregate with other juveniles in the BHS parking lot without a legitimate reason to be there. As a natural consequence of their illegitimate presence, Clark-Kaczmarek reasonably placed BHS in "Secure Status," which disrupted his job duties and the school's natural operations including that parents could not pick up their children, deliveries could not occur, students returning from another event could not enter the school, and students who had appointments could not leave the building. Additionally, Clark-Kaczmarek testified that placing the school in secure status required his full attention, as well as the attention of two assistant

principals, six security officers, three deans of students, and 10 individuals in the front office. He also testified that he had to notify the community when the school entered into "any sort of standard response protocol activity." He explained that the "community" he had to notify included "[s]tudents, families, parents, guardians, staff, [and] anyone that is any sort of stakeholder in the [BHS] community." In short, the illegitimate and intentional presence of Kayley and other individuals on BHS' school grounds constituted wrongful, intentional conduct which naturally and consequently resulted in a disturbance for Clark-Kaczmarek, the BHS school administration, BHS students, their families, and the resulting community in that it interrupted the peace and tranquility of those in the community that were directly impacted by Kayley and the associated group's conduct.

## VI. CONCLUSION

Having found that there was sufficient evidence that Kayley's intentional act by choosing to travel with a group to BHS' campus during school hours with no legitimate reason to be there constituted wrongful, intentional conduct, the natural consequences of which resulted in a disturbance of peace, we affirm the juvenile court's order of adjudication.

AFFIRMED.